Freeburg Law, LLC
Alex F. Freeburg, Bar No. 7-5182
PO Box 3442
Jackson, WY 83001

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| RAYMOND CALDWELL, | |
| Plaintiff, | Case No. 20-CV-00064-NDF |
| vs. | |
| TETON CLUB OWNERS ASS'N., INC;<br>RAINTREE RESORTS MGMT. CO., LLC and<br>JOHN DOES 1-10 | |
| Defendants. | |

## PLAINTIFF'S OMNIBUS RESPONSE TO DEFENDANTS' *DAUBERT* MOTIONS

COMES NOW Plaintiff Raymond Caldwell, and hereby files this *Omnibus Response to Defendants' Daubert Motions*, stating and alleging as follows:

## I.   INTRODUCTION

On March 16, 2021, Defendants' filed Motions seeking exclusion of the testimony of each of Plaintiff's retained experts pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and F.R.E. 702. Defendants' Motions are based solely on perceived deficiencies in the information provided by Plaintiff pursuant to Wyo. R. Civ. P. 26(a)(2)(B). Defendants have not attempted to depose any of Plaintiff's retained experts to further inquire as to the basis for their opinions.

Defendants first argue that Mr. Smiltneek is not qualified to testify about the Teton Club snow/ice melt system even though he has worked as a forensic engineer for over 25 years and has diagnosed failures of mechanical heating systems as part of his employment. They claim that Mr. Smiltneek's testimony should be excluded because he referenced the most accurate available

weather data and photos from the closest date in time to the to the incident as support for his findings. Defendants also take issue with an experiment Mr. Smiltneek conducted during the site inspection in which he poured water on the landing where Plaintiff fell to determine whether water would pool in a subsidence he observed on the landing. They claim that this experiment was not scientific enough and shows that his methodology is flawed; however, Mr. Smiltneek simply demonstrated it was possible for water to collect in the subsidence, which is consistent with Plaintiff's allegations that the landing was icy.

As to Mr. Kingston, Defendants claim that he should be prevented from testifying regarding generally accepted hospitality industry practices even though he has over 40 years of relevant experience in the field of hospitality management and was the general manager for Hotel Terra, a similarly luxurious hotel across the ski run from the Teton Club. Defendants also claim that comparing hotel management to management of a condominium development property like the Teton Club is apples to oranges. This argument ignores the fact that Hotel Terra is in fact a "condominium development," where condominium owners can rent their units short term, just as fractional condominium owners at Teton Club can rent their units short term

Lastly, Defendants argue mischaracterize Plaintiff's lifecare plan. Defendants argue that Mr. Tremp's report must be excluded because he is not qualified to give medical opinions as a certified life care planner. However, Mr. Tremp is not offering medical opinions; Mr. Tremp is offering medical cost estimates based on the medical records provided by Plaintiff's treaters. Defendant's acknowledge that Mr. Tremp bases his cost estimate, in part, on Plaintiff's orthopedic surgeon's note discussing a future shoulder surgery. Mr. Tremp has had some difficulty in confirming Mr. Caldwell's prognosis with his orthopedic surgeon, Dr. Hagerty, and his provider Curtis Harvie, ANP. Any motion to strike is premature, given that medical experts may still be deposed.

## II.   STANDARD OF REVIEW

Pursuant to FRE 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert*, *supra*, at 592-593.

The factors set forth in *Daubert* that may be considered in determining whether a methodology is valid are: (1) whether the theory or technique in question can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether it has attracted widespread acceptance within a relevant scientific community. *Daubert*, *supra*, at 592–594. However, the *Daubert* standard is "a flexible one." *Id.* at 594. Therefore, "[the] Daubert factors do not constitute a definitive checklist or test, and the gatekeeping inquiry must be tied to the particular facts." *Kumho Tire v. Carmichael*, 526 U.S. 137, 138 (1999) [internal citations omitted].

It is also important to note that while *Daubert* permits exclusion of expert witness testimony in limited instances, the *Daubert* Court recognized "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, *supra* at 596.  "...[A]n expert opinion must be based on reliable methodology and must reliably flow from that methodology and the facts at issue—but it need not be so persuasive as to meet a

party's burden of proof or even necessarily its burden of production. *Bunting v. Jamieson*, 984 P.2d 467, 471 (Wyo.1999); (quoting *Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 152 (3rd Cir.1999)).

## III.   ARGUMENT AND CITATION OF AUTHORITY

### a. The *Daubert* Motion as to Plaintiff's retained expert Larry Smiltneek should be denied, as Mr. Smiltneek is qualified to discuss the operation of the snow melt system and the methodology employed in coming to his conclusions is reliable.

*The issue of whether Mr. Smiltneek, P.E., may opine a snow melt system.*

Defendants first claim that Mr. Smiltneek's testimony should be excluded because he is not qualified to offer any opinion regarding the operation of the snow melt system. Doc 32-1, *Defts' Memo ISO Smiltneek Daubert Mtn.,* pg. 2. In his CV, Mr. Smiltneek states that he has worked as a forensic engineer since 1994 and is licensed in the State of Utah as a professional structural engineer. Doc. 18-2, *Smiltneek CV*, pg. 1. He has conducted forensic investigations in the area of "Residential and Commercial Construction Issues, ***Mechanical and Electro-Mechanical System Failures***, Code and Standard Compliance Questions, Collisions – Dynamic Analysis." *Id.* [emphasis supplied]. Mr. Smiltneek's CV also describes his duties as a forensic engineer, which "include investigation of [f]ailures of material and a wide variety of mechanical systems ***including pumps, piping, heaters***…" *Id.* [emphasis supplied]. Defendants' claim that Mr. Smiltneek is not qualified, is contrary to his CV, which expressly states that he has investigated mechanical system failures, including failures in heaters, since 1994.

Mr. Smiltneek, as a registered professional engineer, with expertise in mechanical pumps, piping and heating systems is qualified to assist the jury in understanding Defendant's in floor snow melt system.

*The issue of whether Mr. Smiltneek's methodology is reliable.*

Defendants further claim that Mr. Smiltneek's testimony should be excluded because he relied on photographs from February 23, 2017 and weather data from the Jackson Hole Base weather station to conclude that ice was likely to exist when Plaintiff fell. Defendants relied on these same photos as support for their argument that the snow/ice occurring on January 6, 2017 was an open, obvious, and natural accumulation. *See* Doc. 24-1, *Deft's Memo ISO MSJ*. Nevertheless, Mr. Smiltneek's reliance on these photos as well as weather data from the Jackson Hole Base weather station to form his opinion as to the weather conditions occurring on January 6, 2017 was permissible and does not justify exclusion of his testimony.

While Mr. Smiltneek utilized data from the Jackson Hole Base weather station and stated that this data is representative of the weather conditions at the Teton Club, he was sure to include a diagram showing the distance between the Jackson Hole Base weather station as well as the difference in elevation so that these factors were accounted for. Defendant correctly identifies that absent a weather station at the hot tub area of the Teton Club or a weather report from a meteorologist focusing on that exact location, there is no way to truly know what the weather conditions in the hot tub area were like on the date of Mr. Caldwell's fall. Nevertheless, Mr. Smiltneek is relying on the most accurate available information for the weather conditions that day and photos of the hot tub facilities from the closest date in time to Mr. Caldwell's January 6, 2017 fall. Defendants are essentially taking the position that absent photos from the date in question or specific weather data from the hot tub area, there is no information reliable enough for Mr. Smiltneek to base his opinion on. However, *Daubert* does not require an expert to possess such exact information when forming his opinion.

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

F.R.E. 703.

In this case, any expert would reasonably rely on the Jackson Hole Base weather station data and photos of the location from the same winter season to form his or her conclusion and Mr. Smiltneek's testimony should not be excluded as a result of relying on this information.

Defendants' emphasis on the comparability of historical weather data and conditions occurring on February 20, 2017 – February 23, 2017 to the conditions occurring on the date of the incident is also misplaced, since Mr. Smiltneek's ultimate conclusion, i.e. that it was possible for ice to accumulate in a subsidence he observed at the top of the stairs and that the snow/ice melt system failed to melt this ice, remains the same. The Association is charged with a common law duty of reasonable care in maintaining the hot tub facilities as well as a duty to exercise reasonable care in its voluntary undertaking to perform snow removal services at the hot tub facilities. *See* Doc. 25-1, *Pltf's Resp. to Deft's MSJ*. Regardless of the source of the water that formed the ice or the comparability of weather conditions on other days, the Association is not excused from these duties when it is alleged that ice was permitted to accumulate in a man-made, unnatural subsidence on land that the Association is charged with maintaining, which is exactly what Plaintiff has alleged in this case.

Defendants further argue that Mr. Smiltneek's testimony must be excluded because they claim that he has provided inaccurate testimony that the snow melt system would cause water to overflow and cascade down the stairs. Doc. 32-1, *Deft's Memo ISO Smiltneek Daubert Mtn.*, pgs. 7-9. Defendants are referencing an experiment that Mr. Smiltneek conducted during his site visit in which he poured water onto the landing near the location where Plaintiff fell and observed where the water traveled. Defendants claim that the only Mr. Smiltneek conducted this experiment is to support the proposition that snow would melt, collect as water in the subsidence, overflow and freeze on the stairs. While Mr. Smiltneek stated that this experiment led him to conclude there was an increased probability of the steps being icy, the primary aim of

this experiment was to show that water would collect in the subsidence. Defendants seek to expand this experiment beyond its purpose in an attempt to poke holes in Mr. Smiltneek's methodology, claiming that Mr. Smiltneek should have measured the height of the stair near the subsidence, the slope, the volume of water required to fill the subsidence, among other measurements. *Id.* However, these measurements are superfluous, as they are not necessary to verify Mr. Smiltneek's ultimate conclusion that it was possible for water collect in the subsidence and freeze.

Defendant's further claim that Mr. Smiltneek was required to present data on how much, how fast, or from what area the snow melted, but this data has no bearing on whether Defendant's were negligent in this case. *Id.* As is explained above, the relevant inquiry is whether Defendants permitted snow/ice to accumulate in an unnatural manner, i.e. the subsidence, and whether Defendants exercised reasonable care in their voluntary undertaking to perform snow/ice removal. Mr. Smiltneek's report provides ample evidence supporting the conclusion that the accumulation in question was an unnatural accumulation and this Court should decline to recognize Defendants' attempts to shift the focus from their duty of care.

This case is also distinguishable from *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997). Unlike the expert witness in that case, Mr. Smiltneek is not relying on *ipse dixit*, as his conclusions were proven by an experiment he conducted first-hand while at the site inspection. There is also no analytical gap between his conclusions and the evidence he relied upon to form those conclusions. Had he relied solely upon the February 23, 2017 photos as the basis for his opinion that water could collect in the subsidence, Defendants may have argued that the photos fail to demonstrate the subsidence, despite the fact the subsidence if visible in the photos. Mr. Smiltneek's belt and suspenders approach demonstrates the subsidence by 1) photographing the

subsidence during the site inspection; 2) conducting the water test; 3) and reviewing the

February 23, 2017 photographs, which also show the subsidence.

    In coming to his conclusions, Mr. Smiltneek also considered a great deal of supplemental

information in addition to the February 23, 2017 photos and historical weather data, including:

1. Initial Disclosures dated 7-17-2020.
2. Defendant Teton Club's Answers to Plaintiffs First Set of Discovery Requests dated August 19, 2020 and August 24, 2020 with documents DEF000418 – DEF 000485.
3. Plaintiffs Response to Defendants' First Set of Discovery to Plaintiff, dated 9-16-2020 and signed copy of same.
4. Plaintiff's Notice of Deposition to Defendant Teton Club Owners Association, Inc.
5. Caldwell documents (Caldwell 000001 – 000451).
6. Audio interview of Steve Mitchell by investigator Todd Bontecou lasting 20:34 minutes.
7. Complaint and Demand for Jury Trial for Case 2:20-cv-00064-NFD dated 4-10-2020.
8. Defendants' Answer to Complaint and Demand for Jury Trial.
9. Order on Initial Pretrial Conference dated July 16, 2020.
10. Depositions:
a) Peter Baltes, dated November 5, 2020,
b) Raymond Caldwell, dated November 4, 2020, and
c) Steven Michel, date November 5, 2020.
11. October 29, 2020 preliminary inspection of the Teton Village Club's boiler control room, snow melt system, and accident site.
12. Produced documents: TC000001 – TC000196.
13. Defendant produced documents in response to Plaintiff's 12-17-2020 demand:
a) Hot water, domestic, and snow melt system operation descriptions with 12-18-2020 control logic diagrams,
b) Emails between Long Building Intelligence, who provided and serviced the Teton Clubs boiler and snow melt controls, and Teton Club maintenance personnel with a Long and Associates drawing for Job WTC0052, Sheet 7 page 1 of 2, hot water flow diagram including a description of the snow melt system, and
c) Long Building Intelligence service invoices to the Teton Club from 2012 through 2020 (with no invoices for 2016 and 2017).
14. ETI-HSC-24 (temperature/moisture/snow/ice) pavement sensor data

Doc 18-1, *Smiltneek Report*, pgs. 1-2.

He also relied various statements of Pete Baltes, the Chief Engineer of the Teton Club, in coming to his findings.[1] The multitude of evidence considered by Mr. Smiltneek as well as his first-hand observations and experiment conducted at the site visit provide ample backing for the methodology applied in coming to his conclusions and this Court should decline to grant Defendants' *Daubert* Motion as a result.

   **b. The *Daubert* Motion as to Plaintiff's retained expert David Kingston should be denied, as Mr. Kingston is qualified to discuss the standard of care applicable to the Teton Club Owner's Association (the "Association") and what a reasonable condominium association should have done under the circumstances.**

Defendants claim that Mr. Kingston's testimony should be excluded because his CV does not mention experience in maintenance generally or in maintaining a snow melt system. Doc. 31-1, *Deft's Memo ISO Kingston Daubert Mtn*., pgs. 2-3. However, Mr. Kingston has not been designated as an expert in general maintenance or maintaining snow melt systems, but rather as an expert in the field of hospitality management—i.e. the standard to which a reasonable hotel maintains its hot tub area in Teton Village.

Mr. Kingston's CV shows that he has held General Manager positions and other hotel management positions similar to those held by Teton Club General Manager Steven Michel. Doc. 18-5, *Kingston CV*, pg. 1. He has worked in these positions "…in metropolitan, rural and destination locations, with the last eleven years spent in mountain town locations including Jackson, WY, Bend, OR, and Whitefish, MT." *Id*. Mr. Kingston "…also has over 11 years of residential HOA and CMA management experience at Snake River Lodge & Spa and Hotel Terra located in Teton Village, and Snow King Resort in the town of Jackson." *Id*.

---

[1] Mr. Baltes has a high school education and no specialized training or experience related to maintenance or operation of the snow melt system. Baltes Depo Trans. pp. 6-7, 12, 38-41. His job title is "Chief Engineer," yet he has no background in engineering. However, the Association relies on him to maintain and operate the snow melt system at the Teton Club.

While Mr. Kingston may not be an expert on mechanical operation and maintenance of snow melt systems, he has overseen the operation and maintenance of snow removal systems in his time working in cold weather climates, similarly to the role that Association General Manager Steven Michel occupies. Mr. Kingston is qualified as an expert in the field of hospitality management and as such an expert Mr. Kingston may draw from his knowledge and experience to determine whether Teton Club, acting through its employees (namely, Association General Manager Steven Michel), was negligent by failing to follow the preventative maintenance recommendations of the company that installed the in-floor heating system.

Defendants further claim that Mr. Kingston's opinions regarding generally accepted hospitality industry common practices should be excluded because they are not relevant to a condominium development like the Teton Club. Doc. 31-1, *Deft's Memo ISO Kingston Daubert Mtn.*, pgs. 4-6. However, Hotel Terra, located across the Tram Line ski run from the Teton Club, is also condominium development, and like the Teton Club, its units are rented short term through the property manager.[2] In both cases, maintenance of the hot tub facilities is not the responsibility of the unit owners or hotel guests and is instead charged to an association like the Teton Club Owner's Association, Inc. or some other individual or entity. In addition to managing Hotel Terra, Mr. Kingston has experience in HOA and CMA management at Snake River Lodge & Spa, which, like the Teton Club, is organized as a residential community that also offers vacation rentals.[3]

Mr. Kingston is uniquely positioned to assist the jury in understanding reasonable property and hotel management practices in Teton Village. Defendants have pointed to no affirmative evidence showing how management and operation of hot tub facilities at the Teton

---

[2] This fact is in not in the record through deposition testimony or expert report. However, the Court can take judicial notice of that Hotel Terra is a "condotel." https://www.jacksonhole-real-estate.com/area-map/teton-village/hotel-terra/
[3] *See* https://www.snakeriverlodge.com/

Club would differ in any material respect from management and operation of hot tub facilities at

other vacation properties in the area, such as Hotel Terra. Therefore, Defendants' *Daubert*

Motion as to Mr. Kingston should be denied.

     **c.**  **The *Daubert* Motion as to Plaintiff's retained expert Robert Tremp should be denied, as Mr. Tremp is qualified to discuss the life care plan and treatment recommendations therein and the methodology employed in coming to his conclusions is reliable.**

       Defendants argue that Mr. Tremp's testimony should be excluded because he is

not a "physician, nurse, physician's assistant, etc." and is therefore unqualified to opine

on the cost and frequency of prospective treatment and diagnosis. Doc. 33-1, *Defts'*

*Memo ISO Tremp Daubert Mtn.*, pg. 2. This statement mischaracterizes Mr. Tremp's

opinions; Mr. Tremp is estimating the cost of future medical treatment based on Mr.

Caldwell's medical records.

       In his CV, Mr. Tremp states that he is a Certified Life Care Planner ("CLCP") and

was certified by the Commission on Health Care Certification. Doc. 29-3, *Tremp CV*, pg.

1. "The purpose of the CLCP™ credential is to measure the CLCP™ applicant's working

knowledge of medical systems, associated disabilities, and treatment/maintenance

protocol required for a catastrophically disabled individual to sustain life within an

acceptable comfort level." IHCC, Certified Life Care Planner™ (CLCP™),

https://www.ichcc.org/certified-life-care-planner-clcp.html. The CLCP certification

requires many qualifications prior to even being able to sit for the certification exam.

       Qualifying for the Certified Life Care Planner™ credential is based upon 2 factors; 1) meeting the definition of a "Qualified Healthcare Provider, and 2) the applicant's education and training.

       Before reviewing the educational and training experience component, one must ensure that he or she meets the International Commission on Health Care Certification's definition of "Qualified Health Care Professional." The "Qualified Health Care Professional" definition and a listing of its criteria are detailed in the ICHCC™ Practice Standards and Guidelines available for download on the home

page of this web site. All certification candidates should have this manual in his or her library if certification is a true goal.

The ICHCC™ requires the following criteria to be met by all candidates in order to qualify to sit for the examination:

- Each candidate must have a minimum of 120 hours of post-graduate or post-specialty degree training in life care planning or in areas that can be applied to the development of a life care plan or pertain to the service delivery applied to life care planning. There must be 16 hours of training specific to a basic orientation, methodology, and standards of practice in life care planning within the required 120 hours. The 120 hours may be obtained through online training/educational programs as well as onsite presentations and conferences. Additionally, the following educational components by a ICHCC™ approved CLCP™ program are required:
  - Life Care Planning Methodology (16 credit hours)
  - A course (module) in Catastrophic Case Management (of choice)
  - Vocational Rehabilitation Module.
  - Legal component in life care planning with an onsite testimony/trial experience.
  - Competency - preparation of a life care plan to be reviewed by an approved CLCP™ program or the ICHCC™.
- Applicants should have a minimum of 3 years field experience within the 5 years preceding application for certification. Final approval of any application with ambiguity regarding experience will be left to the discretion of the ICHCC™ Administration following a thorough review of the respective applications. The opinion of the ICHCC™ is final.
- Training hours acquired over a time frame of 5 years from the date of application are counted as valid for consideration. Documentation of such coursework and participation verification is required in the form of attendance verification forms and/or curriculum documentation from the training agency. Each candidate must:
  - meet the minimum academic requirements for their designated health care related profession
  - be certified, licensed, or meet the legal mandates of the candidate's respective state that allow him or her to practice service delivery within the definition of his or her designated healthcare related profession.

*Id.*

Mr. Tremp has undergone rigorous study and training in order to meet these qualifications and has passed the certification exam in order to achieve his CLCP certification. Additionally, "[t]he Certified Life Care Planner™ professional must have his or her CLCP™ credential renewed every 5 years. To maintain the use of the CLCP™ profesional designation, the CLCP™ certificant

is required to provide proof of 80 CEUs acquired over the certification period." *Id.* Mr. Tremp is not diagnosing Plaintiff's injuries or even making individualized treatment recommendations based on diagnoses from other medical professionals. Rather, Mr. Tremp's testimony is limited to projections as to the cost and frequency of future medical care based on his review of diagnostic and treatment records provided to him.

While Defendants claim that the items in Mr. Tremp's life care plan are not "...based on actual medical records or a physician's recommendation,", Mr. Tremp's report states that he did in fact review Mr. Caldwell's medical records prior to forming his opinions. Doc. 28-1, *Tremp Report*, pg. 7. The review of those records has led him to the conclusion that Mr. Caldwell will need the care outlined in Mr. Tremp's life care plan. However, Mr. Caldwell is still undergoing treatment and diagnosis and depending on the opinions expressed by Mr. Caldwell's medical providers Mr. Tremp's recommendations in his life care plan could change. Therefore, rather than fully committing to his recommendations prior obtaining more current information from Mr. Caldwell's physicians about their current treatment recommendations in light of Mr. Caldwell's continued care, he wisely opted to provide for an opportunity to revise such recommendations in the event that those physicians had seen a significant change in Mr. Caldwell's condition.

Upon information and belief non-retained expert witness Dr. Charles Haggerty, one of Mr. Caldwell's treating physicians, has been on vacation and has not responded to Mr. Tremp's request for information. It is anticipated that Mr. Tremp will supplement his report upon Dr. Haggerty responding to this request. However, even if this Court determines that Mr. Tremp's report is deficient because it is "pending physician recommendation," the better remedy at this stage in the case would be to withhold judgment on Defendants' Motion until Plaintiff's treaters testify at trial, are deposed, or supplement their records.

## IV.    CONCLUSION

WHEREFORE, Plaintiff requests that this Court deny Defendants' *Daubert* Motions and grant such other relief as it deems just and proper.

Dated March 30, 2021                    s/_____
                                         Alex. F. Freeburg
                                         *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was sent to:

Julian E. Gabiola                  ☐ hand delivery
jgabiola@hawleytroxell.com         ☐ U.S. mail
Hawley Troxell Ennis & Hawley LLP  ☐ email
412 West Center Street             ☒ CM-ECF
Pocatello, ID 83204

Dated March 30, 2021                    s/_____
                                         Alex F. Freeburg